**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert D. Maguire,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>Cathleen A. Coltrell, et al.,<br><br>　　　　　　　　Defendants. | No. CV-14-01255-PHX-DGC<br><br>**ORDER** |

Plaintiff Robert Maguire claims that his former fiancée, Defendant Cathleen Coltrell, breached a partnership or joint venture agreement to rent and sell two homes for their mutual benefit. Defendant Coltrell asserts various counterclaims against Plaintiff. The Court held a bench trial on October 13-14, 2015, and now finds in favor of Defendant on Plaintiff's claims and in favor of Plaintiff on Defendant's claims. This order will set forth the Court's findings of fact and conclusions of law.

**I.   Findings of Fact – Background.**

In 2005, Robert Maguire and Cathleen Coltrell began a romantic relationship, and Maguire soon moved into Coltrell's home on Justine Road ("the Justine home"). During the 43 months the couple lived there, Maguire contributed $1,500 a month to help pay common expenses, missing about six months of payments. Planning to eventually marry, Maguire and Coltrell signed a prenuptial agreement in February of 2008. Under this agreement, the Justine home was to remain the separate property of Coltrell.

In 2009, Maguire and Coltrell decided to purchase of a new home on Milton Lane ("the Milton home"). Although the plan was to buy the house and take out a mortgage loan jointly, credit problems surfaced for Maguire and the parties decided to have Coltrell procure the loan and purchase the home in her name alone. The purchase price was $570,000. Maguire paid $104,000 of the $160,000 down payment and Coltrell paid the rest. Coltrell borrowed $417,000 in her name. Coltrell maintained her ownership of the Justine home and rented it to tenants.

During the 43 months the couple lived together in the Milton home, Maguire made monthly contributions to living expenses that varied in amount from $1,000 to $2,650, again missing about six payments. The parties each worked on and paid for various improvements to the house and contributed to other household and living expenses. Each was employed and maintained separate bank accounts. There was no strict tracking of money that each contributed to the household or their relationship.

The parties lived together in the Milton home until February of 2013, when Coltrell informed Maguire that she had found someone else and asked him to move out. Coltrell later married John Carmichael and now lives with him in Colorado.

After their breakup, Maguire and Coltrell tried to wind up their financial affairs. They met on February 23, 2013 and put together a spreadsheet reflecting various contributions to the Milton home, financing and potential sales expenses, and an assumed value of $725,000. *See* Ex. 106. On March 1, 2013, Coltrell gave Maguire a check for $10,000, which he cashed and retained. Ex. 139. On March 10, 2013, Maguire sent an e-mail to Coltrell stating: "I will accept the $25k check from you for my contributions into Milton even though I feel that I am coming up way short if you consider what I did for you over the course of our relationship. I don't want anything for that. I just want peace and happiness for us both at this point." Ex. 101. On March 18, 2013, Coltrell provided Maguire with a deposit of $5,000 and a cashier's check for $22,000 which was labeled "Cathleen Coltrell: Final Payment." Ex. 139. Maguire retained the deposit and cashed the check.

One of the items included in the February 23, 2013 spreadsheet was an estimate of $20,500 that Coltrell would be required to pay in interest on a home equity line of credit ("HELOC") she had obtained and used to pay Maguire's past-due 2009 income taxes and his tuition for an executive MBA program. Ex. 106. Because Coltrell would incur approximately $20,500 in interest if it took ten years to repay the HELOC, the couple credited her with this amount in the spreadsheet. When Coltrell unexpectedly received some funds in March of 2013 from the vesting of stock she had earned at work, she used some of the funds to repay the HELOC in full. Upon learning of this, Maguire sent texts and an email to Coltrell stating that he expected her to pay him another $20,000 because she no longer would be required to pay interest on the HELOC. Coltrell disagreed, stating that she had assumed the risk of the HELOC for Maguire's benefit and had used her own funds to eliminate that risk by retiring the debt.[1]

On April 11, 2013, Maguire sent another email to Coltrell enclosing a revised version of the February 23 spreadsheet. Maguire had removed from the spreadsheet the $20,500 in estimated interest on the HELOC and another $40,250 in estimated real estate commissions and closing costs that Coltrell was likely to incur upon sale of the Milton home. Maguire demanded another $50,987.86. Ex. 102. He threatened to disclose embarrassing personal information to Coltrell's friends and co-workers if he was not paid, claimed that he had a "mole" within Coltrell's associates who was feeding him embarrassing information about her, and said "I'm going to come at you real hard." *Id.*

Coltrell did not pay the amounts demanded by Maguire, and Maguire filed suit against Coltrell on May 7, 2014. Doc. 1-1 at 5. Maguire claims that he and Coltrell entered into a joint venture or partnership by agreeing that the Justine and Milton homes would be held as an income-producing property and a residence, respectively, for their mutual benefit and retirement. Maguire brings claims for breach of contract, an

---

[1] The Court views Coltrell's position as the most reasonable. By using her own funds to repay the HELOC that was taken out for Maguire's benefit, Coltrell lost the opportunity to invest and earn interest on those funds. She thus incurred a financial detriment for Maguire's benefit even though she was not required to pay interest on HELOC over ten years.

- 3 -

accounting for the joint venture and partnership, breach of fiduciary duty, and unjust enrichment. Coltrell denies the existence of a partnership or joint venture and asserts counterclaims for invasion of privacy, fraud, negligent misrepresentation, breach of fiduciary duty, and other alleged wrongs.

**II.     Governing Legal Principles for Maguire's Claims.**

   **A.     Partnership and Joint Venture Claims.**

Under Arizona law, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." A.R.S. § 29-1012(A). In the absence of a written agreement, the question of whether a partnership exists is one of fact. *Bohmfalk v. Vaughan*, 357 P.2d 617, 621 (Ariz. 1960). "The essential elements of a partnership may be established by demonstrating the existence of an agreement between the putative partners to work together to acquire property for their joint benefit and to divide all the profits made therefrom equally." *Jolly v. Kent Realty, Inc.*, 729 P.2d 310, 316 n.4 (Ariz. Ct. App. 1986) (citing *Fernandez v. Garza*, 354 P.2d 260 (Ariz. 1960)). "Mere shared ownership in property or profits from the property does not create a partnership." *Holeman v. Neils*, 803 F. Supp. 237, 241 (D. Ariz. 1992); *see also* A.R.S. § 29-1012(C)(1) (stating that joint or part ownership of real property "does not by itself establish a partnership").

"A joint venture differs from a partnership principally because it is usually limited to a single transaction. A joint venture requires an agreement, a common purpose, a community of interest, and an equal right of control." *Jolly*, 729 P.2d at 316 n.4 (citations omitted). An unmarried, cohabitating couple may form a partnership or joint venture. *Cook v. Cook*, 691 P.2d 664, 667 (Ariz. 1984); *Fernandez*, 354 P.2d at 263.

   **B.     Unjust Enrichment.**

"To recover on a claim for unjust enrichment, a claimant must show (1) an enrichment, (2) an impoverishment, (3) a connection between the two, (4) the absence of justification for the enrichment and impoverishment and (5) the absence of any remedy at law." *Loiselle v. Cosas Mgmt. Grp., LLC*, 228 P.3d 943, 946 (Ariz. Ct. App. 2010)

- 4 -

(quotation and citation omitted); *see also Mousa v. Saba*, 218 P.3d 1038, 1045 (Ariz. Ct. App. 2009). "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Harmon v. Harmon*, 613 P.2d 1298, 1301 (Ariz. Ct. App. 1980) (citation omitted).

**III.   Findings of Fact on Maguire's Claims.**

   **A.   Partnership/Joint Venture.**

      **1.   The Justine Home.**

Coltrell purchased and owned the Justine home before she met Maguire. At all times relevant to this case, the Justine home was titled in Coltrell's name and she was the sole borrower on the mortgage loan. Coltrell arranged for and paid utilities for the home, and did the same for property insurance. McGuire was never listed on the title, the mortgage loan, the utilities, or the insurance.

As the parties were planning to marry, they drafted and signed a prenuptial agreement. Ex. 110. The agreement, in Schedule A2, listed the Justine home as Coltrell's separate property. *Id*. The agreement provided that the property listed on Schedule A2 "will be and remains the property of the owner described in the said schedule and the other party will have no right to or interest in such present property." *Id*. Schedule A2 further provided that the mortgage and HELOC on the Justine home were Coltrell's separate debts. *Id*. Although the agreement stated that it would become effective only upon the marriage of Coltrell and Maguire, and they were never married, the agreement clearly reflects their recognition that the Justine home was Coltrell's separate property and their intent to keep it that way.

After the parties moved into the Milton home, Coltrell rented the Justine home. Coltrell drafted and signed the leases, collected the rents, and deposited the rents in her own accounts. Maguire's name was never on the leases and he never received rents from the Justine home.

When the parties split up in early 2013 and sought to settle their financial affairs, two versions of a spreadsheet were created, emails were exchanged, and Coltrell made

payments totaling $37,000 to Maguire. The two spreadsheets, including the revised version prepared by Maguire, never reflected any distribution to Maguire related to the Justine home. Exs. 103, 106. Maguire's demands from Coltrell, including his demand for $50,987.86 that was accompanied by threats, never sought payment for any portion of the Justine home. Exs. 67, 101, 102. If the parties had agreed that Maguire owned a share of the Justine home, or if Maguire believed this to be the case, he surely would have mentioned this fact in the documents exchanged as the parties sought to wrap up their financial affairs.

Maguire has produced no written evidence that he and Coltrell ever entered into a partnership or joint venture agreement with respect to the Justine home – no contract, no memorandum, no partnership agreement, no joint venture agreement. Nor did Maguire and Coltrell ever file partnership or joint venture tax returns or claim in their individual tax returns that they were parties to a partnership or joint venture.

In summary, Maguire has failed to prove the existence of an agreement with respect to the Justine home as required by Arizona law for a joint venture or partnership to exist. *Jolly*, 729 P.2d at 316 n.4. If anything, the prenuptial agreement shows that the parties agreed the Justice home would *not* be held jointly, in any form.

Maguire testified that a partnership or joint venture agreement was reached, but he never identified the date of the agreement, its terms, how it was reached, or why it was not reduced to writing. The Court finds Maguire – on this issue and others – to be less credible than Coltrell. Maguire's lack of credibility arises not only from his such gaps in his testimony and his demeanor during trial, but also from several specific facts that raise questions about his honesty and character: Maguire falsely represented on his resume that his former business, ATG, had been sold, when in fact it had failed; he testified that Coltrell knew he was listing her as an owner of the Streamline business when the Court is persuaded that she did not know; he testified at trial that he owned one-half of the Milton home, but testified in his deposition that he owned two-thirds; he expressly agreed to accept $25,000 for his interest in the Milton home, but later demanded more; he

threatened to expose embarrassing facts about Coltrell and claimed to be spying on her through a "mole" among her friends; and, although he testified at trial that he did not mean the threats included in his April 11, 2013 email to Coltrell, he testified in his deposition that he did mean them.

### 2. The Milton Home.

Maguire failed to produce any written document reflecting a partnership or joint venture with Coltrell regarding the Milton home – no contract, no memorandum, no partnership agreement, no joint venture agreement. Maguire and Coltrell never filed partnership or joint venture tax returns with respect to the Milton home, or claimed in their individual tax returns that they were partners or joint venturers with respect to the Milton home.

Although Maguire and Coltrell initially intended to purchase the Milton home jointly, with each acting as a borrower on the mortgage loan, this changed when Maguire's credit problems interfered with the financing. As a result, the home was purchased solely in Coltrell's name. She was also the sole debtor on the mortgage loan.

Although the parties intended to acquire the home jointly when they were making plans to be married, the Court cannot conclude that this intention rose to the level of a partnership agreement or joint venture. As already noted, "[m]ere shared ownership in property or profits from the property does not create a partnership." *Holeman*, 803 F. Supp. at 241 (citation omitted). Indeed, Arizona statutes specifically provide that joint or part ownership of real property "does not by itself establish a partnership." A.R.S. § 29-1012(C)(1).

What is more, documents created during the parties' attempt to disentangle their financial affairs do not suggest that the parties intended or expected Maguire to receive one-half of the profits when the Milton home was sold. In an apparent attempt to work out a reasonable resolution of their financial affairs, the parties included in the first spreadsheet a value for the Milton home of $725,000. Ex. 106. When Maguire later revised the spreadsheet to increase his demand, he did not change this number. Ex. 103.

- 7 -

1  Nor did he claim that he would be entitled to future payments when the Milton home
2  actually sold.  In fact, he represented just the opposite.  Maguire's revised spreadsheet
3  included this statement: "When [Coltrell] sells[,] the house will be in the $800k to $1M+
4  range, *which she keeps*."  Ex. 103 (emphasis added).  In the April 11, 2013 email to
5  Coltrell that accompanied the revised spreadsheet, Maguire said: "You stand to make a
6  mint on that house."  Ex. 102.

7  These documents strongly suggest that the parties did not have an agreement that
8  Maguire was a partner or joint venturer in the Milton home who would receive one-half
9  of the profits when it was sold.  In addition, as noted above, the Court does not find
10 Maguire's testimony to the contrary credible.  Maguire has failed to carry his burden of
11 proving that the parties entered into a partnership or joint venture agreement with respect
12 to the Milton home.

13 **B.  Unjust Enrichment.**

14 In addition to an enrichment and an impoverishment, a party seeking to recover for
15 unjust enrichment must show "the absence of justification for the enrichment and
16 impoverishment."  *Loiselle*, 228 P.3d at 946.  In other words, the party must show that it
17 would be unjust for his opponent to retain the enrichment without compensation.

18 Maguire claims that Coltrell was unjustly enriched by money he paid for living
19 expenses while at the Justine home, improvements he made to the Justine home, the
20 contribution he made to the Milton home down payment, payments he made for living
21 expenses while at the Milton home, improvements he made to the Milton home, and cars
22 he provided to Coltrell.  The Court finds, however, that Maguire has failed to prove that
23 his failure to recover these contributions would be unjust.

24 This was a romantic relationship.  Maguire and Coltrell were engaged.  They
25 planned to marry – to spend the rest of their lives together.  Viewing all of the evidence,
26 the Court finds that the parties did not view this as a business, partnership, or joint
27 venture.  Maguire and Coltrell instead undertook the same comingling of finances that
28 engaged and married couples typically experience.  Both contributed financially to their

household; both paid for improvements; both paid for groceries, services, entertainment, clothing, and furniture. It was not until after the relationship ended that Maguire claimed they were engaged in a business venture.

Maguire and Coltrell derived from their relationship the benefits that normally flow to engaged or married couples – love, affection, mutual support (financial and emotional), and stability. In addition, Maguire's daughter had a room at the Justine and Milton homes and lived with Maguire and Coltrell from time to time. Maguire did not pay additional sums to Coltrell while his daughter was living with them. Further, during their years together, Coltrell was solely responsible for the Justine and Milton mortgage loans; Maguire never assumed liability for those substantial debts. Coltrell also took out HELOCs on both the Justine and Milton homes and used the funds for the couple's mutual benefit, not only in maintaining the homes but also in paying Maguire's past due taxes and his tuition for an executive MBA course.

In short, given the nature of their relationship and the absence of a partnership or joint venture agreement, the Court cannot conclude that Maguire was unjustly impoverished or Coltrell unjustly enriched by the contributions Maguire made to their relationship. This was a personal romantic relationship, not an arm's length business arrangement. Maguire has failed to carry his burden of proof on his unjust enrichment claim.

### C. Other Claims.

Because the Court finds that Maguire has failed to carry his burden of proof in establishing the existence of a partnership or joint venture, the Court further finds that Maguire has failed to establish that Coltrell owed him fiduciary duties that were breached. Maguire has also failed to prove that he is entitled to an accounting for a partnership or joint venture. The Court will enter judgment against Maguire on all of his claims against Coltrell.

## IV. Governing Legal Principles for Coltrell's Claims.

Arizona courts have adopted the tort of intrusion upon seclusion as set forth in the

Restatement: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."  Restatement (Second) of Torts § 652B; *Hart v. Seven Resorts, Inc.,* 947 P.2d 846, 853 (Ariz. Ct. App. 1997).

>A comment to the Restatement describes this tort:
>
>The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home.  It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires.  It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.

Restatement § 652B, cmt. b.

The restatement makes clear, however, that the tort arises only when a defendant intrudes upon a place of privacy or seclusion established and maintained by the plaintiff. "The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." *Id*., cmt. c.  In addition, there is no liability unless the interference with the plaintiff's seclusion is a "substantial one, of a kind that would be highly offensive to the ordinary reasonable man." *Id*., cmt. d.  These principles are recognized in Arizona cases.  *Hart*, 947 P.2d at 853; *Shupe v. Bank of Am., NA.*, No. CV-13-00019-TUC-JGZ, 2015 WL 1120010, at *6 (D. Ariz. Mar. 12, 2015).

**V.      Findings of Fact on Coltrell's Claims.**

**A.      Intrusion Upon Seclusion.**

Coltrell testified about several incidents in support of her claim for intrusion upon seclusion.  She testified that Maguire listed her as a member of a business known as

1 Streamline Group without her knowledge. *See* Ex. 116. She further testified that
2 Maguire produced, in this litigation, a photograph of Coltrell and her new husband at a
3 gathering with others. *See* Ex. 155. She further testified that Maguire posted on his
4 Facebook page a photograph of her, Maguire, and friends at a party in December 2012.
5 *See* Ex. 153.

6 None of these events constitutes an intrusion upon seclusion. None involved
7 Maguire's deliberate intrusion into a sphere of privacy or seclusion Coltrell had created.
8 Use of her name on a business document, without her authorization, did not intrude upon
9 any private sphere of her making, nor did the use or posting of photographs that were
10 taken publicly at events attended by other people. The Court finds that these incidents do
11 not satisfy the Restatement's requirements for an intrusion upon seclusion.

12 Coltrell also identified Maguire's April 11, 2013 email in which he claimed to
13 have a "mole" in her group of associates who was providing embarrassing information
14 about her. Ex. 102. Maguire did not identify the mole or the information he was
15 receiving, but he did threaten to expose it. Coltrell does not claim that Maguire ever
16 exposed or disseminated such information.

17 Although spying on another person through a mole among that person's close
18 associates might in some cases qualify for the tort of intrusion upon seclusion, the Court
19 cannot find that Maguire's actions – inappropriate and immature though they were – rose
20 to the level required by the Restatement of being a "substantial" intrusion that would be
21 "highly offensive to a reasonable person." *Hart*, 947 P.2d at 853; Restatement § 652B,
22 cmt. d. Maguire did claim to have a mole among Coltrell's associates, but she did not
23 prove that his claim was true. She presented no evidence (other than Maguire's threat)
24 that a mole actually existed and actually intruded upon her seclusion. Nor did she present
25 evidence that any confidential or sensitive information was ever acquired by a mole and
26 transmitted to Maguire.

27 Coltrell testified that Maguire's claim of a mole caused her emotional distress, but
28 she has not sued for infliction of emotional distress. She has made a very specific claim –

intrusion upon seclusion. Offensive as Maguire's threat was, the Court finds that Coltrell has failed to present evidence that Maguire actually intruded upon her seclusion within the meaning of the Restatement and Arizona law.

### B. Coltrell's Other Claims.

Coltrell has also asserted counterclaims for fraud, negligent misrepresentation, breach of fiduciary duty, and breach of contract, but her statements in her Proposed Final Pretrial Order (Doc. 73) and her Proposed Findings of Fact and Conclusions of Law (Doc. 72) make clear that these claims are asserted only if the Court finds that Maguire has proved the existence of a partnership or joint venture. Coltrell did not present evidence to sustain her claims for fraud, negligent misrepresentation, breach of fiduciary duty, and breach of contract.

Coltrell's counterclaims also include a request for punitive damages, but her counsel stated at the close of trial that she was not seeking any independent recovery under this claim. Nor are punitive damages appropriate when Coltrell has failed to prove her underlying claims.

### VI. Conclusion.

The Court finds that Maguire has failed to prove the existence of a partnership, joint venture, or unjust enrichment, and that Coltrell has failed to prove her claims. This was a romantic relationship and engagement that ended without marriage. Although the Court does not doubt that the feelings of both parties are real, the Court does not find any of their claims to be well-founded.[2]

---

[2] In reaching this conclusion, the Court does not rely on the testimony of Coltrell's expert, Michael Adams. The Court found his testimony to be irrelevant to the findings and conclusions set forth in this order.

**IT IS ORDERED:**

1. Robert Maguire has failed to prove his claims against Cathleen Coltrell.

2. Cathleen Coltrell has failed to prove her claims against Robert Maguire.

3. The Clerk shall enter judgment accordingly and terminate this action.

Dated this 20th day of October, 2015.

*David G. Campbell* (signature)

David G. Campbell
United States District Judge